OPINION OF THE COURT
Harold Fertig, J.
The defendant raises a question, previously undetermined in New York, where he is charged with operating a motor vehicle with .10% or more alcohol in his blood in violation of subdivision 2 of section 1192 of the Vehicle and Traffic Law.
After being arraigned the defendant moved, as part of an omnibus motion, for an order of discovery and inspection, requesting the production of any comparison ampoule and gouge test ampoule, which may have been used in connection with the administration of a breathalyzer test. The People’s answering affirmation stated that "The gouge test ampoule utilized in the breathalyzer test is not retained by the police department.” The defendant then moved for an order to suppress the evidence of the breathalyzer machine, on the grounds that the failure of the police department to preserve the ampoules constitutes a violation of the defendant’s constitutional rights of due process.
CPL 240.20 provides that property, except exempt property, within the custody or control of the District Attorney is subject to discovery provided it is material to the defendant’s defense and the request is reasonable.
It has also been held that defense counsel shall have access to evidence gathered by the government which might lead a jury to entertain a reasonable doubt about the defendant’s guilt. Such right is protected by the due process requirement of the Constitution (United States v Bryant, 439 F2d 642).
Accordingly, the court ordered a hearing to determine the extent of prejudice, if any, to the defendant by the failure of the People to preserve and produce the ampoules; the materiality of such evidence; and, whether such request was reasonable.
At the hearing, two expert witnesses were presented. One, Detective Bruno of the Nassau County Police Department, called by the People, and, the other, Herbert Goldstein, presented by the defendant. Both witnesses were qualified chemists and experts in their field. Much of their testimony corroborated each other. The court finds that the breathalyzer *287 machine determines the content of a person’s blood alcohol by analyzing the breath of the subject’s lower lungs. In simplistic terms, the individual’s breath is gathered in the machine and caused to pass through a solution which changes color in proportion to the amount of alcohol passing through it. That solution is purchased by the Nassau County Police Department from its manufacturer, in glass sealed ampoules, which are filled under a vacuum. The chemical content of the ampoules is test-checked at random and all ampoules having the same lot number are filled from the same vat. After the test-checks are made, and the chemical content of each ampoule is noted to be the same, except for miniscule differences, it is accepted that all ampoules in that lot have a known chemical compound. Since the quantity of the solution used is significant, each ampoule is placed in a "go-no go gouge” to determine the diameter of the ampoule and the height of the miniscus of the solution. Knowing the diameter and height of the liquid in the ampoule, it can be determined that there are at least three milliliters of solution in the ampoule. A lesser amount would result in a falsely high reading. The two ends of the gouge are of different sizes, therefore an ampoule is not used if it does not either fit into the "go” side or does fit into the "no go” side. The height of the liquid, which at the top forms a crescent, or miniscus, is determined by the operator viewing by eye the bottom of the curve to be at least at the top of the gouge.
The chemical content of the solution is composed of 99.95% of 50% sulphuric acid solution with water; .025% potassium dichromaté; and .025% silver nitrate. The test ampoule is placed into the machine and its color, prior to test, is compared with the comparison ampoule, which remains sealed and stable as a control. The test ampoule is broken open and a bubbler is inserted into it. Equal light passes through both ampoules through blue filters and the meter is equalized. As the defendant’s breath is forced through the solution any alcohol in the breath is held in solution by the sulphuric acid and the potassium dichromate reacts with any ethyl alcohol, changing it to acetic acid and chromic sulphate, causing the solution to change color through the filter from greenish to bluish. The silver nitrate acts as a catalyst, causing the chemicals to react without having any bearing on the result. The amount of color change can then be determined. From the degree of change in color the amount of alcohol which *288 passed through the solution can be calculated, and the results recorded.
Properly preserved, the solution in the ampoule can be laboratory tested for up to one year thereafter to determine the amount of alcohol which actually passed through it. The amount of potassium dichromate remaining in the solution can be determined either by chemical analysis or by chromatic analysis. Since the chemical content prior to the test is known, by subtracting the amount of potassium dichromate remaining after the test from the amount in the ampoule at the start of the test, it can be determined how much potassium dichromate was used up, thereby indicating the total amount of alcohol which passed through the solution. In this way, by simple arithmetic, a jury can determine whether the results of the test were accurate, or they might have a reasonable doubt as to the accuracy of the test.
It was also pointed out that the quantity of the solution which is essential to an accurate result, if properly preserved, would remain intact and could be scientifically determined at a later date.
The ampoule, which is made of glass, would, if it had a defect, and the test light was passed through such a defect, affect the results. Again, these are possible questions which, if available and presented to the jury might give rise to a reasonable doubt as to the defendant’s guilt.
The People’s witness had difficulty describing a method of resealing the glass ampoule which was broken at its neck, with a ragged edge. However, defendant’s expert, being more imaginative, described a method to preserve the ampoules, which the court finds logical and reasonable. It is also interesting to note that the expert recalled by the People for rebuttal testimony had little significant objections to that method.
In order to preserve the ampoule, it would have to be sealed without the impurities of natural air. Can this be done reasonably? From the testimony, the court finds that the ampoule does not need absolute vacuum, and it can be placed into a dark plastic container, while in a glove box, with air, drawn out by comparatively simple means, causing a small vacuum, or under a blanket of nitrogen, an inert material, which would help force normal air out, and have no effect on the material. A teflon cover properly secured on the container would suffi *289 ciently seal it and preserve the contents of the ampoule for up to one year. Each plastic vial containing the ampoule can then be placed in a box having raised cutouts in its bottom to hold the container in an upright position. The boxes containing the ampoules thus sealed can be stored for future use.
The People argue that the preservation of the ampoules would serve no purpose since it has been held that they only need prove beyond a reasonable doubt (1) that the operator of the breathalyzer machine was qualified by schooling; (2) that the machine was properly calibrated; (3) that the chemicals used were of the proper kind and mixture; and (4) that the test had been administered in accordance with the rules and regulations of the police department (People v Donaldson, 36 AD2d 37).
The defendant argues that, even though the People may have met their burden of proof to make out their case by a fair preponderance of the creditable evidence, he has a right to a defense, and a right to rebut that proof.
The basis of the defendant’s claim is set forth in Brady v Maryland (373 US 83, 87), where our Supreme Court stated, "We now hold that the suppression by the prosectuion of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.”
It is not necessary that at the time of the application for discovery the exact content of the nondisclosed materials be known. It is enough that it be such material which if presented during trial would assist in the search for the truth (United States v Bryant, 439 F2d 642, supra). Referring to Brady v Maryland (supra), the court said (p 648): "Were Brady and its progeny applicable only when the exact content of the non-disclosed materials was known, the disclosure duty would be an empty promise”.
Therefore, if such ampoules were available, this court finds that they would be material to the defendant’s defense and the request is reasonable.
Although the Supreme Court has not defined evidence "favorable” to the accused, it would appear that it would apply to all evidence which might have led a jury to entertain a reasonable doubt about defendant’s guilt (United States v Bryant, supra).
*290 The duty to disclose, of course, rests with the police as well as the District Attorney (United States v Bryant, supra).
This court is satisfied that in this case the destruction of the ampoules and their contents was neither malicious nor in bad faith but was in conformity with the rules and procedures of the police department, and treated no differently than all other tests similarly conducted.
However, the question is the failure to preserve material evidence and have it available for disclosure when requested. We have here neither a case of bad faith suppression of evidence, nor was it such a loss which might be the result of good faith, as set forth in United States v Augenblick (393 US 348). The destruction was an intentional act based upon accepted police procedures.
"[T]he duty of disclosure attaches in some form once the Government has first gathered and taken possession of the evidence in question * * * Hence we hold that before a request for discovery has been made, the duty of disclosure is operative as a duty of preservation. Only if evidence is carefully preserved during the early stages of investigation will disclosure be possible later.” (United States v Bryant, supra, at p 651.)
Is the destruction of these ampoules conforming with police procedures an act which should receive sanctions? The court in Bryant stated (p 651): "An exception for good faith loss of important evidence must not be allowed to swallow the discovery rules, and the burden of explanation on the Government must be a heavy one”.
Good faith loss would not invoke sanctions but the question of negligent destruction has been avoided (see Killian v United States, 368 US 231, 242; Campbell v United States, 365 US 85, 98).
In Bryant (439 F2d 642, 652, supra) the court further reasoned, "systematic non-preservation of tapes involving Government undercover agents — as in the case before us — might be regular, but would be insufficiently protective of defendants’ right to discovery. Accordingly, we hold that sanctions for non-disclosure based on loss of evidence will be invoked in the future unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve all discoverable evidence gathered in the course of a criminal investigation. The burden, of course, is on the Government to *291 make this showing. Negligent failure to comply with the required procedures will provide no excuse.”
Brady also made it clear that although there is an exception for good faith loss of evidence, there is no exception for good faith administrative decisions that certain evidence is not discoverable and thus need not be preserved (see United States v Bryant, p 652, n 21, supra).
Since this State has not made any definitive determination with respect to this question, and recognizing the significance of this finding, this court has examined opinions on both sides of the question, in other jurisdictions.
The principal case relied upon by the defendant is People v Hitch (12 Cal 3d 641). That court held that the test ampoule used in the breathalyzer, its contents and the reference ampoule constitute material evidence on the issue of the driver’s guilt or innocence of operating a vehicle under the influence of an intoxicating liquor. The court found that the preservation of the ampoules would add a reasonable possibility that they might impeach the accuracy and credibility of the results of the test. In following the dictates of Augenblick, Brady and Bryant, the court determined that the prosecution has the burden of demonstrating that the duty to preserve the ampoules had been fulfilled. The court further determined that failing that requirement the court will require that the results of the breathalyzer test be excluded from evidence, rather than that the case be dismissed, since such evidence is not a necessary element of a prosecution for drunk driving. In that case, the evidence presented showed that the contents of the test ampoule and the ampoule itself would, if preserved, provide information of value to the prosecution and the defense. There is a reasonable possibility, the court indicated, that those components would impeach the accuracy and credibility of the results of the test. After finding that the intentional but nonmalicious destruction of the ampoules would require that the results of the breathalyzer tests be excluded from evidence, the court decided that since the destruction of the ampoules was accomplished in good faith and in conformity with law enforcement procedures the evidence, in that case, should not be suppressed. However, it held that prospectively all breathalyzer evidence would thereafter be suppressed if the ampoules were not preserved. There is a strong dissent to the prospective application of the court’s decision.
In New Jersey, the New Jersey Superior Court in State v *292 Teare (135 NJ Super 19, 22) refused to suppress the results of a breathalyzer test where the ampoules were destroyed, because the credible evidence in the record "established that preservation of the ampoule would not give any scientifically reliable information regarding the accuracy of the original test results”.
In State v Watson (48 Ohio App 2d 110), after finding that the State’s expert testified that any later chemical analysis of the test ampoule would be inconclusive, and since the defendant did not present any expert witness, the court concluded that it could not follow the Hitch case (12 Cal 3d 641, supra) in California. Nevertheless, the Ohio court held that the test ampoule and its solution might be material to the preparation of the defendant’s defense, and ordinarily excludable from evidence when made unavailable to him. Not so here, the court said, because there is no evidence that the preserved ampoule would produce conclusive results.
In Michigan’s Court of Appeals, People v Stark (73 Mich App 332), determined that since the breathalyzer is a scientifically reliable device accurate for measuring blood alcohol content; and the expert testimony indicated that the chances of an inaccurate result due to ampoule irregularity are minute; and the contents of the ampoule were of little value after 30 days; the ampoules would not be material evidence.
In Lauderdale v State (548 P2d 376 [Alaska]), the Supreme Court of Alaska found that the test and reference ampoules could be probative evidence of the propriety or impropriety of the breathalyzer test for several reasons. After the test is given, the quantity of the solution, which is critical, can be accurately measured, since the test itself does not materially change the solution. The amount of potassium dichromate could probably possibly be measured, and the character of the glass, where imperfections wpuld render the reading incorrect could also be determined. Comparing the ability to examine the test ampoule after the test to the cross-examination of a witness, the court held that the denial of that right would be the denial of a fair trial which is essential to affording an accused due process of law. The court went on to find the good or bad faith of the State, in not being able to produce the ampoule, to be of no import. Turning to the State’s argument that there would be serious difficulties and tremendous efforts in adopting procedures to preserve the ampoules, the court stated (p 382): "We are certain that the state, with all of its *293 vast human resources, will be able to find suitable methods to preserve the ampoules for later scientific analysis when discovery is sought by a defendant”.
The court, addressing itself to practical considerations, determined that its finding that the sanction of suppressing the breathalyzer test, when the ampoules were not preserved, should be applied prospectively in most cases and provided for limited retroactive application, including giving the benefit of the decision to the litigant in that case.
The court, in State v Michener (25 Ore App 523), affirmed the lower court’s order of the suppression of the breathalyzer test. It found that a retest can be done up to at least 19 months after the original test. It held that the results of the breathalyzer test are material on the issue of defendant’s guilt or innocence. The court declared (pp 523-524): "Because the breathalyzer test results obtained by the state in these cases were material, other evidence affecting the 'credibility’ of those results would necessarily also be material in that they might be used for purposes of impeachment.” The court reasoned that since the determination of whether the evidence demanded is favorable to the defendant can only be resolved by scientific test, the defendant need only make a showing that the claim is reasonable, under the circumstances, and so long as there was no strong showing by the prosecutor that the destroyed evidence was (p 523) "useless and of doubtful materiality,” defendant is entitled to an order of disclosure. It was held that since there was a sufficient showing of materiality, the failure to produce the ampoules warranted the suppression of the breathalyzer test.
In a recent case of State v Helmer (— SD —, 278 NW2d 808), the court finding that there was no "reasonable possibility” that the evidence obtained by preserving the ampoule would be exculpatory. Therefore, the failure to preserve the ampoule was not a denial of due process. It is interesting to note that it was found that the accused’s ability to have an independent blood test taken to challenge the breathalyzer was sufficient protection of defendant’s rights.
Reviewing the opinions in the various other jurisdictions, this court can reach only one conclusion. The reasoning and principals of law relied on by the courts varied very little from State to State, regardless of whether or not the breathalyzer test was suppressed. Rather, the courts’ determinations depended essentially on the findings of fact made as a result *294 of the evidence presented in each case. Where the evidence was insufficient to show that preservation of the ampoule could serve a scientifically useful purpose, the sanction of suppression was not imposed. On the other hand, in those jurisdictions where there was evidence that the possible later scientific testing of the ampoule could possibly raise an issue as to the reliability of the breathalyzer, and it was not preserved, the sanction of suppression was imposed.
In the case before this court the testimony is uncontroverted that the ampoules can be preserved, will permit scientific analysis for up to one year after the test and might be favorable to the defendant in his defense to possibly impeach the People’s evidence and the testimony of their witness. The People are not able to make the argument that they were unaware of the materiality of the ampoules, since their own witness, Detective Bruno, a chemist working in the police laboratory, testified as to its usefulness in making subsequent scientific tests, if properly preserved.
This court cannot accept the reasoning of some courts that the ability of the defendant to have his blood analyzed by his own physician pursuant to section 1194 of the Vehicle and Traffic Law is sufficient to protect his due process rights. The improbability of a defendant, arrested for drunk driving, held at a police headquarters for testing and questioning, having the presence of mind to call his own physician, and the improbability of that physician arriving at police headquarters in time to take a sample of the accused’s blood, within two hours of arrest, cannot be ignored.
Absent that probability, are we to prevent him the opportunity to discredit the evidence presented by the People?
Accepting the determination that the breathalyzer is a scientific instrument, that if operating properly, and operated properly, by a qualified technician, in accordance with the rules and regulations of the police department, is a generally reliable device for measuring the concentration of alcohol in the blood; and the People having proven all of the above, beyond a reasonable doubt, sufficient to make out a prima facie case, can we say that the defendant cannot rebut such presumption of guilt? This court reasons that an accused should have the opportunity to do so by any competent evidence he might wish to produce, and finds that the ampoules used in the test could provide such competent evidence and are material to the defense of the defendant.
*295 This court is not unmindful of the extent of accidents, serious injuries and even fatalities resulting from vehicles being operated by drivers who are intoxicated. However, even the need for a solution to that dreadful problem does not justify a conviction resulting from an unfair trial where the accused is deprived of his rights of due process. It may appear to be expedient to the purpose but it is inconsistent with our system of justice, and the rights afforded everyone under our Constitution.
This court is aware of the serious consequences of a possible retroactive effect of a determination such as this on similar cases awaiting trial. However, it cannot determine whether there will be a prospective or retroactive effect, but must make its determination on the facts of this case.
Since the ampoules in question are material to the very test which the People seek to use to prove the guilt of the defendant; and there is scientific proof that such ampoules may be properly preserved to permit laboratory tests which might disprove the reliability and results of the breathalyzer test; and such proof might be favorable to the defendant; such ampoules are material and necessary to the defendant’s defense. The ampoules having been destroyed by the police department require that sanctions be imposed.
Accordingly, the defendant’s motion is granted and any evidence of the breathalyzer is hereby suppressed. The case is set for trial on January 8, 1980, District Court in Nassau County, Criminal Part VIII, West Wing, Mineóla, New York, at 9:30 a.m.